The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Lawrence Shuping, Jr. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except with minor modifications.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. At the time that the plaintiff's alleged occupational disease arose on or about October 5, 1993, the parties were subject to, and bound by, the provisions of the Workers' Compensation Act.
4. At the time plaintiff's alleged occupational disease arose on or about October 5, 1993, plaintiff had an average weekly wage of $572.04, yielding a compensation rate of $381.36.
5. The plaintiff was paid Accident and Sickness benefits at the rate of $184.05 per week for 26 weeks beginning on or about April 29, 1994. If the Industrial Commission determines that the plaintiff is entitled to temporary total or temporary partial disability benefits for any of that time, then the City is entitled to a credit of $184.05 per week on a week for week basis.
6. Plaintiff's medical records were stipulated into evidence.
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is a 6 ft. 2 inch, approximately 190 pound 31 year old separated male with two preschool age children. He has a degree in Communications from Howard University and in the fall of 1994 enrolled in the Master's program in Public Administration at the University of North Carolina at Charlotte, but subsequently withdrew because of being unable to function because of the stress-related problems giving rise to the instant claim. In college he played baseball and remains physically active despite the emotional problems giving rise hereto by continuing to teach aerobics as well as self-defense, among other things.
2. Prior to moving to Charlotte from his home in Brooklyn, New York in 1989 plaintiff had been employed for eight months by the City of New York as a recreation director in a shelter for homeless families. Plaintiff has also attempted work in the communication field where he had his degree, but did not enjoy the work.
3. Since allegedly being forced to leave defendant's employ on April 11, 1994 because of the stress-related problems giving rise hereto, plaintiff has not made a reasonable but unsuccessful attempt to find any type of other full-time employment. The only full-time job that he has applied for was one as a fitness director at the YMCA. Rather, plaintiff has been content to work a number of part-time jobs, including teaching aerobics at both the downtown YMCA and Simmons YMCA, being a personal aerobics trainer for several individuals, teaching self-defense courses at Central Piedmont Community College, teaching defensive driving for the Safety and Health Council, and appearing as "Robocop." Plaintiff earned an average of $250.00 to $300.00 a week working part-time.
4. In August 1989 plaintiff became employed by the City of Charlotte as a patrol officer responsible for patroling his district and there performed the usual and customary duties of a police officer, including, but not limited to, answering calls and arresting lawbreakers. Throughout his period of employment as a patrol officer he always worked the second shift that ran from 2:00 p.m. to 10:00 p.m. in the Charlie 2 district where he was initially assigned and from 2:30 p.m. to 10:30 p.m. in the Baker 3 district where he worked his remaining period of employment as a patrol officer.
5. Although while working as a patrol officer he was occasionally required to pull his weapon, plaintiff never had to shoot anyone and was never shot at himself or even had a gun pointed at him. He did, however, encounter victims of violence, including individuals that had been killed, and on occasion had to use physical force to subdue or arrest a suspect.
6. In 1982, plaintiff unsuccessfully sought a transfer to the DARE program and the following year at his request became a school resource officer assigned to Cochran Middle School at the beginning of the school year in September 1993. He remained at Cockran Middle School until December of that year when he was transferred to Wilson Middle School because of the Administration's dissatisfaction with his work at Cockran Middle School. He worked as a school resource officer at Wilson Middle School until the staff there also became dissatisfied with his work. He was again transferred to Marie Davis Middle School where he worked until stopping work altogether on April 11, 1994 because of the stress-related emotional problems giving rise hereto.
Although in his school resource officer's job plaintiff was required to wear his patrolman uniform and carry a weapon, he was never physically or verbally threatened by any of the students at the schools to which he was assigned nor was he aware of a school resource officer ever having been assaulted by a student.
7. The involved occupational disease claim is for the allegedly disabling occupational stress disorders, adult adjustment disorder, and post traumatic stress disorder, plaintiff developed due to his employment by the City of Charlotte as a patrol officer and/or school resource officer resulting in him having the burden of not only establishing that his employment was a significant contributing factor in the development of the same conditions, but that his employment placed him at an increased risk of developing the same disorders as compared to members of the general public and other employments not exposed to similar job stress.
8. Plaintiff denies having any problems with job-related stress until after the burial of two fellow City of Charlotte patrol officers that were shot and killed at a housing project on October 5, 1993. He attributes his stress-related disorders to the same officers' deaths and the suicide of another officer after he had stopped working for defendant employer in April 1994 because of his emotional problems. Plaintiff, however, had never worked directly with the three officers, only barely knew two of them and was not a close friend of the third.
9. There is absolutely no evidence of record that plaintiff's job as a patrol officer and/or school resource officer placed him at an increased risk of developing the job-related stress disorders giving rise hereto as compared to members of the general public and other employments at large not exposed to similar stress. Dr. Wilkenfeld was never asked about the issue of increased risk; but rather, only causation of the adult adjustment and post traumatic stress disorders he diagnosed manifested by plaintiff's emotional lability, sleeplessness and loss of appetite, among other symptoms. Even assuming arguendo that plaintiff's employment placed him at an increased risk of developing the type of stress-related orders giving rise hereto, plaintiff's testimony and other evidence, which, if believed, would tend to establish that he did not experience any work-related stress problems until after the burial of his two fellow officers that were shot and killed at the housing project on October 5, 1993 and it is a result of these deaths and the subsequent suicide of another officer that caused the stress-related disorders preventing him from returning to law enforcement or other similar type work is not accepted as credible.
10. When he initially saw Dr. Justis for evaluation of his stress-related symptoms on April 25, 1994 and was thereby referred to the psychiatrist, Dr. Wilkenfeld, who has since treated him, plaintiff indicated that his symptoms had been present for three years and were the result of unhappiness with his current employment situation because he had been involved in several job changes. These same problems, however, did not begin after the deaths of plaintiff's two fellow police officers on October 5, 1993; but rather, had begun several years earlier while he was still a patrol officer, which is not only consistent with what he told Dr. Justis, but what he said in the twenty-eight page recorded statement taken of him by defendant employer regarding the circumstances of his claim for job-related stress. In the recorded statement there are documented problems that plaintiff had with his patrol officer's job as early as 1992, and had begun with a civilian complaint requiring a hearing, as well as his difficulty getting along with supervisors and disputes about whether he should be allowed to obtain additional training or should always work second shift resulting in a conflict about how plaintiff ideally perceived his role as a patrol officer and his actual role in the real world where he had to deal with the public as well as police authorities.
11. The most reasonable explanation for why plaintiff sought to transfer to the DARE program in 1992 and to become a school resource officer the following year was because of his unhappiness as a patrol officer. Unfortunately, from the time he began working as a school resource officer at the start of the school year in September 1993, plaintiff had similar problems getting along with administrative staff at Cockran Middle School, which occurred prior to the two officers' deaths on October 5, 1993. The particular nature of these problems is documented by the memorandums of September 20, 1993 and September 28, 1993, defendant's exhibits number 3 and 4, which are hereby incorporated by reference as if fully set out herein, but include problems with plaintiff isolating himself where he could not be found by the staff. As a result of these same problems the administrative staff at Cockran Middle School, became dissatisfied with plaintiff's work and requested that he be transferred to another school in December of that year. After plaintiff's requested transfer to Wilson Middle School, he had similar problems with the administration there and they also requested his transfer to yet another school, which was to Marie Davis Middle School where he was working when he left defendant's employ on April 11, 1994.
12. Any job-related stress that plaintiff had in his job as either a patrol officer or school resource officer was not caused by the duties of the job themselves; but rather, was caused by plaintiff's inability to properly perform the same jobs as evidenced by his inability to get along with fellow officers, police supervisors, school administrators and civilians. Dr. Wilkenfeld's opinion, which if believed would tend to establish that plaintiff's post traumatic stress disorder was caused by the two officers' deaths and subsequent suicide of another officer was based on the inaccurate history given by plaintiff that he had not experienced any stress-related problems prior to those deaths when in fact he had problems with job stress for some three years.
* * * * * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
For the reasons stated in the above findings of fact, plaintiff has not satisfied his burden of proving that he has developed the disabling job stress disorders giving rise hereto, adult adjustment disorder and post traumatic stress disorder, due to causes and conditions which are characteristic of and peculiar to his particular employment as a patrol officer and/or school resource officer by the City of Charlotte, but excluding all ordinary diseases of life to which the public is equally exposed outside of that employment. G.S. 97-53(13). (See, Crossv. Blue Cross/Blue Shield, 104 N.C. App. 284, 49 S.E.2d 103 (1991).
* * * * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
ORDER
1. Plaintiff's claim must be and is hereby DENIED.
2. Each side shall bear its own costs, except that defendant shall pay an expert witness fee in the amount of $300.00 to Dr. Wilkenfeld, who appeared by way of deposition and gave expert medical testimony herein.
 S/ __________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ _________________________ THOMAS J. BOLCH COMMISSIONER
S/ _________________________ DIANNE C. SELLERS COMMISSIONER
LKM:bjp